FILED

97 JAN 31  PM 5: 00

U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DISVISION**

| | |
|---|---|
| **BARBARA HOSEA-STUDDARD,** | } |
| | } |
| **Plaintiff,** | } |
| | } |
| **v.** | }    **CASE NO. CV 95-B-2385-S** |
| | } |
| **BESSEMER STATE TECHNICAL** | } |
| **COLLEGE, ALABAMA STATE** | } |
| **BOARD OF EDUCATION,** | } |
| | } |
| **Defendants.** | } |

ENTERED

FEB 03 1997

**MEMORANDUM OPINION**

Currently before the court are the motions for summary judgment of defendant Bessemer

State Technical College ("Bessemer State") and defendant Alabama State Board of Education

("Board"). Upon consideration of the record, the submissions of the parties, the argument of

counsel and the relevant law, the court is of the opinion that both motions are due to be granted.

Plaintiff has alleged violations of Title VII of the Civil Rights Act, 42 U.S.C. § 1981 and

42 U.S.C. § 1983 against both defendants contending that she has been discriminated against

because of her race and sex in the wage that she is and has been paid. Furthermore, plaintiff

asserts that defendant Bessemer State has unlawfully retaliated against her for her having filed a

charge of discrimination with the EEOC. Defendant Bessemer State counters that it has not

discriminated against plaintiff in violation of Title VII or § 1981 in the wage she has been paid

and that any difference between plaintiff's wage and the wages of other employees of Bessemer

State is the result of legitimate, non-discriminatory considerations. Furthermore, Bessemer State

asserts that it has not retaliated against plaintiff and that plaintiff cannot point to any adverse

employment action or harm suffered by plaintiff as a result of the alleged retaliation. The Board

*48*

also denies that it has discriminated against plaintiff in violation of Title VII or § 1981. Furthermore, the Board asserts that it does not have a contract with plaintiff and is not plaintiff's employer as that term is understood under Title VII. Finally, both the Board and Bessemer State claim that they are immune from suit or otherwise not properly subject to suit under sections 1981 and 1983.

## FACTUAL SUMMARY[1]

### I. Wage Discrimination

Plaintiff, Barbara Hosea-Studdard, is a black female. She graduated from the University of Arkansas at Pine Bluff in 1966 and went to work as a public school teacher for the Detroit Board of Education in Michigan in September 1966. (Pl.'s Aff. ¶ 2). Plaintiff worked for the Detroit Board of Education for the next twenty years. During that time, plaintiff earned a Master's degree in Art Education from Wayne State University and accumulated forty semester hours of credit toward a Ph.D. in Gerontology. (Pl.'s Aff. ¶¶ 2-3). In 1987 Hosea-Studdard took a leave of absence from the Detroit Board of Education and returned to Birmingham for personal reasons. (Pl.'s Aff. ¶ 4). In 1988 she made her leave permanent and began to actively seek employment in Birmingham. (Pl.'s Aff. ¶¶ 4-5).

After moving to Birmingham, plaintiff attended a displaced homemakers, single parents and single pregnant women's class at Bessemer State where she met Betty Batson, the "instructor/counselor/program director." (Pl.'s Aff. ¶ 6). At Ms. Batson's request, plaintiff assisted in instructing and counseling the students in Ms. Batson's absence on several occasions.

---

[1] Although many of plaintiff's factual allegations are disputed, for purposes of this opinion, all reasonable inferences are drawn in favor of the plaintiff.

2

(Pl.'s Aff. ¶ 6). While substituting for Ms. Batson, plaintiff met Mattie Hendrix (now Mattie Ray) who requested plaintiff's résumé to forward to the president of Bessemer State, Dr. Michael Bailey. (Pl.'s Aff. ¶ 7). After subsequent discussions and meetings, plaintiff interviewed with Dr. Bailey and Ron Moon for a position as a Commercial Art Lab Assistant. (Pl.'s Aff. ¶¶ 7-9). Plaintiff was hired and began work as a Commercial Art Lab Assistant in October 1988, though she understood that this position was "only an entry level position to get me in place for a more responsible position." (Pl. Aff. ¶ 9). Plaintiff's starting pay was $13.00 per hour. (Pl.'s Aff. ¶ 9).

Plaintiff alleges that she encountered repeated hostility and abuse as a lab assistant and instructor and that she reported such abuse, but she has not produced even anecdotal evidence of specific instances of abuse or hostility. After plaintiff apparently threatened to leave the college as a result of this abuse, Dr. Bailey created and appointed plaintiff to the "Placement/Follow-Up Analyst" position in March 1989. (Pl.'s Aff. ¶ 12). In this position, plaintiff worked a forty-hour week out of the Admissions Office and was initially paid $7,000 per quarter. (Pl.'s Aff. ¶¶ 12, 15). Plaintiff's salary was increased to $7,560 per quarter in September 1990. (Pl's Aff. ¶ 15).

The Placement/Follow-Up Analyst position was discontinued in August 1991 for organizational reasons, and plaintiff was encouraged to apply for Director of the "Displaced Homemakers, Single Parents and Single Pregnant Women Projects and Projects to Overcome Sex Bias and Sex-Role Stereotyping in Occupational Training" (hereinafter "Displaced Homemakers Program" or "Mirror Program"). (Pl.'s Aff. ¶ 17). Although plaintiff apparently did not want this job at the time she applied, she had been informed that Bessemer State could not otherwise guarantee her a job, and she applied for the Director's position in the summer of 1991. (Pl.'s

3

Aff. ¶ 17).  The position was advertised with a salary range from $28,000-$32,000 annually, (Def. Ex. 2), and plaintiff was hired at $25,200 from September 24, 1991 to June 30, 1992. (Def. Ex. 5).  Plaintiff's contract was extended for the months of July and August 1992, making her total pay from September 24, 1991 to September 1, 1992, $30,240.  (Def. Ex. 6).  Plaintiff contends that she was not satisfied with the salary offered her in 1991 but that she was told she could "take it or leave it."  (Pl.'s Aff. ¶ 21).  She made notations in the margin of her contract to the effect that the salary was too low given her qualifications.  (Def. Ex. 5).

Plaintiff has continued in her position as the head of the Displaced Homemakers Program. In that position, plaintiff has been on salary schedule C-3.  (Def. Ex. 5).  Beginning in September of each year, plaintiff's annual salary was $32,659 for 1992-93, $34,782 for 1993-94, $37,738 for 1994-95 and $37,738 for 1995-96.  (Def. Ex. 1).  These salaries represent approximately an 8% raise in 1992-93, a 6.5% raise in 1993-94, an 8.5% raise in 1994-95 and no raise in 1995-96.

In August 1993 plaintiff wrote a memorandum to Ed Blake, Dean of Instruction at Bessemer State, outlining some of her achievements and requesting a 25% "cost of living increase" in her salary.  (Def. Ex. 10).  Dean Blake responded to plaintiff on September 9, 1993 by return memorandum that the state legislature had authorized a 6.5% increase for salary schedule C and that plaintiff's salary would be increased by that amount.  (Def. Ex. 11).  Following this denial of plaintiff's request for a 25% raise, on September 13, 1993, plaintiff filed a charge against Bessemer State with the EEOC of race-based wage discrimination.  (Def. Ex. 12).

Plaintiff claims that she was denied the raise she sought while other schedule C-3 employees were given raises in excess of the 6.5% authorized for 1993-94 and the 8.5% authorized for 1994-95.  Cynthia Anthony, a black female, received a 10.71% raise in 1993-94

4

and a 16.5% raise in 1994-95. (Pl. Ex. 4). John Hayes,[2] a white male, received an 8.14% raise in 1993-94 and the standard 8.5% raise in 1994-95. (Pl. Ex. 4). Charles Murray, a white male, received the standard 6.5% raise in 1993-94 and an 11.2% raise in 1994-95. (Pl. Ex. 4). Gregory Murray, a black male, received a 6.5% raise in 1993-94 and a 13.2% raise in 1994-95. (Pl. Ex. 4). Sundra Smith, a black female, received a 10.7% raise in 1993-94 and a 10.0% raise in 1994-95. (Pl. Ex. 4). Finally, Dennis Winn, a white male, received the standard raise in 1993-94 and a 14.0% raise in 1994-95. (Pl. Ex. 4). All other schedule C-3 employees at Bessemer State received either no raise or the standard 6.5% raise in 1993-94 and 8.5% raise in 1994-95. (Pl. Ex. 4).

According to Ron Moon, the additional raises listed above were given because of an expansion of duties rather than on account of "merit." Dennis Winn's salary was raised in 1994-95 because of an expansion of his duties with regard to new program development, week-end classes, and industrial training support. (Aff. of Ron Moon, November 1, 1996 ("Moon Aff. II") ¶ 3(b)). Charles Murray received a raise in 1994-95 because he took on the additional responsibility of supervising the industrial electronics department, which had four full-time instructors. (Moon Aff. II ¶ 3(e)). Although no expansion of duties was outlined for John Hayes, he received no raise in 1992-93 while plaintiff received an 8.0% raise in that time period. (Def.

---

[2] Plaintiff's exhibit 4 lists the Director of Plant Operations as John Layes. Defendant's exhibit 8 lists the Director of Plant Operations as John Hayes. It is the court's understanding that the plaintiff's exhibit is a chart generated from the information in defendant's exhibit 8. Therefore, the court is operating on the assumption that "Layes" is a typographical error and that "Hayes" is the correct spelling. This assumption is obviously not important to the outcome of these motions.

5

Ex. 8). Thus, his slightly higher raise in 1993-94 was offset by his not receiving a raise the year before.

As another aspect of her wage discrimination claim, plaintiff asserts that she is paid less than whites and males with similar duties and responsibilities. Plaintiff claims that she performs tasks similar to those performed by Charles Murray, Ralph Bearse, Levell Dansby and Betty Batson. Plaintiff is Director or Coordinator of the Displaced Homemakers Program, which provides a number of services for two populations of students--displaced homemakers, single parents and single pregnant women; and "a gender equity group of students enrolled in nontraditional (male or female) training programs."[3] (Pl.'s Aff. ¶ 22). The services provided by the program include: case management for participants; career awareness and exploration; orientation; personal development; career, academic, personal and interpersonal individualized and group counseling services; basic skills building to assist academically under prepared students; assessment and evaluation; prevocational training; job skills training; motivational and self-esteem building; job placement and follow-up; referrals to community resources and organizations; resume, cover letter, interview, job shadowing and job referral services; classroom monitoring of participants' academic performance with instructional feedback; classroom visitations to monitor participants' adjustments to training environments; financial assistance to enroll in the college's training programs; and collaboration opportunities provided with employees, social agencies and other community agencies' requests. (Pl.'s Aff. ¶ 22). Furthermore, plaintiff designs curriculum content and resources for Personal Development 110, a psychology course.

---

[3] The court is unclear as to the meaning of the phrase "gender equity group."

6

(Pl.'s Aff. ¶ 23).  Plaintiff also develops and writes two federal proposals to secure grant funds to continue the two projects each year.  (Pl.'s Aff. ¶ 23).  Plaintiff is also responsible for writing and submitting two final reports to the Department of Postsecondary Education each fall to outline the success of the program.  (Pl.'s Aff. ¶ 23).  Finally, plaintiff conducts two surveys each year, an "Entering Student Survey" to assess student opinion "on services linked to their success and education or training at the college", and a "Student Satisfaction Survey" to "collect data from the current and prior years' participant populations."  (Pl.'s Aff. ¶ 23).

In 1995-96, the Displaced Homemakers Program had 55 students, and the Project to Overcome Sex Bias had a total of 28 students.  (Pl.'s Aff. ¶ 24).  Thus, plaintiff had to maintain files on and manage cases for a total of 83 students.  According to the plaintiff, these populations in these programs were not unusual.  (Pl.'s Aff. ¶ 24).

Plaintiff administers an annual budget of approximately $49,500 and supervises a part-time secretary who works approximately nineteen hours per week 26 weeks of the year.  (Def. Ex. 13, Aff. of Ron Moon,[4] August 13, 1996 ("Moon Aff. I") ¶ 3).  Plaintiff does not supervise any instructional programs or instructional personnel.  (Def. Ex. 24, Moon Aff. II ¶ 4).  Plaintiff is not responsible for the dissemination of any official public information, and she has no responsibility for recruiting, (Moon Aff. II ¶ 4), except that plaintiff does distribute information about and recruit for the two programs she directs and coordinates.  (Pl.'s Supplemental Aff.

---

[4] Ron Moon is the Dean of Human Resources and Academic Support at Bessemer State. He has been responsible for personnel administration at Bessemer State for the past ten years. (Moon Aff. I ¶ 2).

7

("Pl.'s Supp. Aff.") ¶ 10).   Plaintiff has no responsibility or authority for writing curricula except for the one class that she teaches each year.  (Moon Aff. II ¶ 5).

At various times in her affidavits and briefs, plaintiff has compared herself to the head of the Displaced Homemakers Program at Lawson State Community College, and the defendants have introduced evidence regarding the director of that program, as well.  In her supplemental affidavit, however, plaintiff stated that the Lawson State program is "significantly different" from the one plaintiff directs at Bessemer State.  (Pl.'s Supplemental Aff. ¶ 26; *see also id.* at ¶¶ 25-27).  Therefore, the evidence relating to the Lawson State position is not relevant to plaintiff's claim that defendants discriminated against her on the basis of race in regard to her salary.

Charles Murray is the Director of Community Relations.  He has been employed at Bessemer State since December 1985 and supervises fourteen employees and a combined annual budget of $1,312,270.00.  (Moon Aff. I ¶ 4).  Mr. Murray's annual salary in 1994-95 and in 1995-96 was $48,900.00.  (Moon Aff. II ¶ 3(e)).  He plans, organizes and evaluates the college's information services; develops and implements market strategies to promote the college; serves as college spokesman for the media; and serves as liaison between the college and high schools.  (Moon Aff. I ¶ 4).  Mr. Murray has directly supervised a number of instructional programs, including: Air Conditioning and Refrigeration; Building Construction; Building Maintenance; Commercial Art and Photography; Drafting and Design Technology; Graphics and Printing; Horticulture; Industrial Maintenance; Small Engine Repairs; and Welding.  (Moon Aff. II ¶ 4).  These programs have 12 full-time instructors and "numerous part-time/adjunct faculty" who report directly to Mr. Murray.  (Moon Aff. II ¶ 4).  Mr. Murray is the official spokesman for every aspect of the college and is responsible for most printed documents or electronic communications

8

that are "official public information of the college."[5]   (Moon Aff. II ¶ 4).  He disseminates approximately 400,000 advertising pieces per year and is responsible for recruiting activities at the college as they relate to advertising, direct-mail and media presentations.  (Moon Aff. II ¶ 4). He manages the approximately $250,000 advertising and printing budget for the college.  (Moon Aff. II ¶ 4).

Ralph Bearse is the Curriculum Specialist at Bessemer State.  He has been employed at Bessemer State since December 1985 and is the highest paid schedule C-3 employee at Bessemer State.  (Moon Aff. I ¶ 5).  His 1995-96 salary was $50,120.  (Moon Aff. I ¶ 5).  Mr. Bearse has over 20 years of experience in writing technical and vocational curricula.  (Moon Aff. II ¶ 5). In his position at Bessemer State, Mr. Bearse's main duty is to review, revise and write curricula for the college.  (Moon Aff. II ¶ 5).  He analyzes training requirements and recommends curricula relevant to occupational requirements of business and industry.  He has designed "competency-based formats of instruction[]" for all departments and restructured the automotive technology curricula in accordance with NATEF standards for ASE certification which resulted in ASE certification for the GM, Ford and Toyota automotive programs at Bessemer State.  (Moon Aff. I ¶ 5).  Mr. Bearse also establishes course content and objectives for the Nursing Assistant program.  In addition, he has written school policies concerning copyright, curriculum and media services, and media equipment.  (Moon Aff. I ¶ 5).  Bearse was responsible for a $250,000 budget for course and curriculum development.  (Moon Aff. I ¶ 5).

---

[5]  Mr. Moon's affidavit states that Charles Murray is responsible for every printed document or electronic communication that is official public information of the college, but plaintiff's supplemental affidavit states that she is responsible for the dissemination of official public information with regard to proposals for the programs she directs.  (Pl.'s Supp. Aff. ¶ 10).

Bearse has also served as the Interim Director of the Allied Health Programs. In that capacity, he supervised sixteen full and part-time faculty and staff and approximately 150 students per quarter and managed annual budgets exceeding $750,000. (Moon Aff. I ¶ 5). As Interim Director, he was responsible for executing policies established by the State Board of Education, the Alabama Board of Nursing, the American Dental Association and the Alabama Department of Health. (Moon Aff. I ¶ 5).

When Betty Batson retired from Bessemer State, she was a schedule C-1 employee whose career at the college spanned more than twenty years. (Moon Aff. II ¶ 8). Her salary at the time of her retirement was approximately $55,000 per year. (Pl.'s Aff. ¶ 35). Ms. Batson's duties involved more than just running the Displaced Homemakers Program. She was Bessemer State's guidance counselor, Coordinator of Student Affairs, and head of the "Mirror Program" (the displaced homemakers program). (Moon Aff. II ¶ 8). When Ms. Batson retired, she was replaced by plaintiff and a new guidance counselor, and other current employees assumed some of Batson's duties as well. (Pl.'s Aff. ¶ 35; Moon Aff. II ¶ 8).

Levell Dansby, a black male, is the Associate Degree Automotive Instructional Program coordinator/instructor. (Moon Aff. II ¶ 9). In 1993 he was made the acting coordinator of this program, and in 1995 he was appointed to this position on a permanent basis after earning his B.S. degree. (Moon Aff. II ¶ 11). When his appointment became permanent, he received a 5% salary increase, making him the only schedule C-3 employee to receive any raise in 1995-96. (Moon Aff. II ¶ 11). Mr. Dansby reports to Mike Hobson, the Associate Dean of Transportation Technology. In his capacity as Associate Dean, Mr. Hobson "supervises" the General Motors program. (Moon Aff. II ¶ 10).

10

## II. Retaliation

On September 13, 1993, plaintiff filed her first charge with the EEOC alleging wage discrimination on the basis of her race.  On April 28, 1994, plaintiff filed her second EEOC charge alleging retaliation and discrimination.  The facts relevant to this charge of retaliation are outlined below.

In her second EEOC charge, plaintiff alleged, as part of her retaliation claim, that:

[T]he College failed to notify me on a timely basis of a meeting scheduled in Montgomery regarding the program I direct; it delayed forwarding to me in a timely manner the proposal package for completion; and, it delayed signing off on the proposals until the last day, thereby causing me to have to drive to Montgomery to deliver the proposals.

(Def. Ex. 14).  Plaintiff has not provided any additional facts concerning the meeting in Montgomery of which defendant Bessemer State allegedly failed to notify her.  When asked about the meeting at her deposition, plaintiff did not know when the Department of Postsecondary Education scheduled the meeting, when Dr. Bailey received the information regarding the meeting, how long Dr. Bailey had the information before conveying it to plaintiff or how far in advance of the meeting Dr. Bailey had the information.  (Pl.'s Dep. at 96-97).  Furthermore, plaintiff did attend the meeting.  (Pl.'s Dep. at 96).

Plaintiff's EEOC charge says "it" delayed forwarding a proposal package in a timely manner to her for completion.  Plaintiff contends that "it" refers to an individual, but she does not know who.  (Pl.'s Dep. at 97).[6]  Also, plaintiff does not present evidence as to how the proposal

---

[6] The questions and responses by the plaintiff regarding this allegation were as follows:
Q:      You also refer to a delay in forwarding to you in a timely manner the proposal package for completion.  What proposal package are you referring to in that clause?

11

was delayed getting to her before she submitted it for review--she does not know if she got it a day before it was due or a week before it was due or when she got it. (Pl.'s Dep. at 100). Plaintiff then submitted the proposals for Dr. Bailey's signature, but Dr. Bailey did not sign them until the last day. (Pl.'s Aff. ¶ 39). Plaintiff had to drive the proposals to Montgomery on the day they were due in order to submit them on time. (Pl.'s Aff. ¶ 39; Dep. of Ed Blake ("Blake Dep.") at 95-96). The proposals were not signed earlier because Dr. Bailey was apparently unavailable to sign them until the last day. (Blake Dep. at 93-94). Ed Blake stated in his deposition that he had intended to carry the proposals to Montgomery but had to leave for his meeting in Montgomery too early in the morning to get them signed before leaving. (Blake Dep. at 93). As a result, plaintiff had to drive the proposals to Montgomery herself.

Plaintiff also alleged in her second EEOC charge that, "[t]he college has also harassed me by bombarding me with a series of memoranda, calls and visits regarding a memorandum I sent a colleague." This allegation refers to a memorandum that plaintiff sent to Gina Crumpton, Debbie Marcus and Shirley Roy entitled "A Request for Professional Respect." (Pl.'s Dep. at 101-03; Def. Ex. 15).

---

A:    To develop proposals for funding for Displacement [sic] Homemakers and the Sex Bias Program.

Q:    You say "it delayed." Who do you mean delayed?

A:    It should not have been it.

Q:    What should it have been?

A:    An individual.

Q:    Who, which individual?

A:    I'm not sure which individual. My immediate supervisor at that time was Ed Blake.

(Pl.'s Dep. at 97).

12

On February 24, 1994, plaintiff was in a conference counseling a student who was upset because her grandfather had been killed. (Pl.'s Dep. at 106; Def. Ex. 15). Apparently, at this time students were in the process of registering for classes, and some students needed to see plaintiff in order to get tuition waivers. (Pl.'s Dep. at 106). A student "pounded" on plaintiff's door to get her attention at the direction of Ms. Roy (a secretary in the Office of Student Financial Services). (Def. Ex. 15). Furthermore, Debbie Marcus left a message with the Bessemer State operator to tell plaintiff that a student needed to see her when she finished her conference. (Def. Ex. 16). The operator called plaintiff with this information, interrupting the conference. (Def. Ex. 17). Plaintiff was in her regular office with the light on but no sign was posted on her door. (Def. Exs. 16 & 17). The counseling session lasted for approximately an hour and a half. (Pl.'s Dep. at 107).

This series of events prompted plaintiff to write the memorandum entitled "A Request for Professional Respect." In this memorandum, plaintiff outlined her objections to the fact that her conference was interrupted. (Def. Ex. 15). Debbie Marcus, the head of the Office of Student Financial Services, responded with a memorandum explaining her actions and the actions of her staff (Ms. Crumpton and Ms. Roy). (Def. Ex. 16). This exchange continued so that eventually plaintiff had sent two memoranda to Ms. Marcus and Ms. Marcus had responded twice. (Def. Exs. 15-18). Eventually, Ed Blake became involved in the exchange, having at least one discussion with plaintiff regarding this series of memoranda and sending a memorandum of his own to her. (Def. Ex. 19). Plaintiff responded to his memorandum on April 4, 1994 and filed her second EEOC charge on April 28, 1994. (Def. Exs. 20 & 14).

13

Debbie Marcus wrote at the beginning of her second memorandum: "While I hesitate to continue to exchange memoranda with you, I feel I must respond in writing to your most recent missive . . . ." (Def. Ex. 18). At the end of that memorandum, Ms. Marcus wrote:

> The incident of February 24, which has now prompted two memos from each of us, was, from my perspective, a minor event in the day's activities. I simply left a message for you so that you would know when you became available that several students--and one in particular--needed to see you. At the time I left the message (11:15 or thereabout), many staff take lunch breaks. Given the concerns of the students, I wanted you to be aware of their needs before you took your lunch break. My concerns were legitimate, professional, and student centered.

(Def. Ex. 18).

Debbie Marcus also wrote in her second memorandum that she was "disturbed by references in [plaintiff's] memoranda." (Def. Ex. 18). In her initial memorandum, plaintiff wrote that "'certain' educators" are not valued for their experience, qualifications and ability, but rather "the yardstick of measurement renders respect based on some limited hierarchial [sic] perception of an individual's societal position/worth or genealogical inheritance."[7] (Def. Ex. 15). In her second memorandum, plaintiff wrote: "It was only after coming to this college to work that I have been treated as an INVISIBLE human being by some of my associates." (Def. Ex. 17). Finally, after the exchange of memoranda with Ms. Marcus and a discussion with Ed Blake, plaintiff wrote in a memorandum to Ed Blake that: "My further response is that your present action in concert with the President, Mr. Cox, and Ms. Marcus is of a conspiratorial nature, and is considered by me to be racially motivated harassment in retaliation for my filing a charge of discrimination with the [EEOC] . . . ." (Def. Ex. 20).

---

[7] Plaintiff explained at her deposition that the term "genealogical inheritance" referred to the fact that she is a black female. (Pl.'s Dep. at 108).

14

Another aspect of plaintiff's claim involves a reduction in her performance evaluation. In June 1995, plaintiff's performance evaluation was reduced from "superior" to "satisfactory." (Pl.'s Aff. ¶ 37(c)). Ed Blake reduced plaintiff's rating and the rating of two other employees, Al Craig and Dennis Winn, at the direction of Dr. Bailey. (Def. Ex. 26; Blake Dep. at 55, 60). Blake had given all three of these employees a rating of superior, which Blake stated was "rather high" (Blake Dep. at 55, 60), and Dr. Bailey expressed his concern about these ratings in a memorandum to Blake. (Def. Ex. 26). In the memorandum, Dr. Bailey mentioned that no other employees had received an overall evaluation of superior and that he considered Blake's evaluations to be inconsistent with evaluations submitted by other senior staff members. (Def. Ex. 26). Therefore, Dr. Bailey requested that Blake reevaluate the three employees that he had evaluated, in accordance with the memorandum and their discussions, so that the evaluations would be consistent with those conducted by other staff members. (Def. Ex. 26). Therefore, Blake reevaluated and reduced the ratings of plaintiff, Craig and Winn. (Blake Dep. at 57). Both Craig and Winn are white males. (Def. Ex. 8).

Plaintiff also contends that her office was moved from its location in the Building A Career Center to the Millsap Industrial Training Center in retaliation for her filing a charge of discrimination. (Pl.'s Aff. ¶ 37(e)). The office in the Millsap Center was located "completely away from all other student services." (Pl.'s Aff. ¶ 37(e)). The "Dressing for Success" boutique was no longer accessible to students because it had to be located in the basement of the Millsap Center. (*Id.*) Also, supplies and other career training materials were no longer accessible to students because of a lack of space and "proper facilities." (*Id.*) Plaintiff further contends that after the move she no longer had "ready access to an instructional seminar classroom facility."

(*Id.*) At her deposition, plaintiff stated with regard to her new office: "[I]t does not meet the total needs of my students although it is a nice office." (Pl.'s Dep. at 146).

Ed Blake explained in his deposition that plaintiff's office move was part of a routine move to "better utilize the limited space that [they] had at the college." (Blake Dep. at 67). The Licensed Practical Nursing ("LPN") Program was moved into the space out of which plaintiff had been moved. (Blake Dep. at 67). The LPN Program was a larger program than the Mirror Program and had more employees and needed more space. (Blake Dep. at 68). According to Blake, the LPN Program had a "large number of instructors" and a new person in charge and "required more space." (Blake Dep. at 73). Blake "felt like that the LPN Program required more space," and "tried to provide the best space possible" for the Mirror Program when it was moved. (Blake Dep. at 73).

## SUMMARY JUDGMENT STANDARD

Under FED. R. CIV. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23; *see* FED. R. CIV. P. 56(a) and (b). Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine

16

issue for trial.'" *Celotex*, 477 U.S. at 324. Rule 56 (c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.

If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (citations omitted); *accord Spence v. Zimmerman*. 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## DISCUSSION

As an initial note, plaintiff's complaint and brief in opposition to defendants' motions for summary judgment allege discrimination on the basis of sex as well as race and retaliation. Neither of plaintiff's EEOC charges, however, allege sex discrimination. Plaintiff's first EEOC charge specifically states that she is being discriminated against on the basis of her race. Plaintiff's second EEOC charge lays out the factual basis for her retaliation claim and alleges discrimination by defendants. Nowhere in either of these charges does the plaintiff allege sex

17

discrimination. Because plaintiff is bound by the scope of her EEOC charges, she cannot now assert a claim for sex discrimination for the first time in her complaint.[8] *See Turner v. Orr*, 804 F.2d 1223, 1226 (holding that the "'scope' of the judicial complaint is limited to the 'scope' of the EEOC investigation that can reasonably be expected to grow out of the charge of discrimination") (citations omitted). Because sex discrimination was not alleged in either EEOC charge, it was not within the scope of the EEOC investigation reasonably expected to grow out of the charge. Therefore, the only issues before the court involve plaintiff's race discrimination and retaliation claims.

## I. Intentional Discrimination Under Title VII and 42 U.S.C. § 1981

Plaintiff has brought claims of race discrimination and retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e-17, 42 U.S.C. § 1981 and 42 U.S.C. § 1983. Plaintiff has not introduced any direct evidence of discrimination, nor has plaintiff established a pattern and practice of discrimination on the part of the defendants.[9]

---

[8] As will be noted below, even if the plaintiff could assert a claim for discrimination on the basis of her sex, she has not established intentional discrimination by the defendants on the basis of sex.

[9] Plaintiff argues that "defendant has an immediate past history of racial discrimination and its pattern and practice of discrimination has been established under the *Shuford* Consent Decree." (Plaintiff's Memorandum in Opposition to defendant Bessemer State Technical College's Motion for Summary Judgment at p. 2). Therefore, plaintiff contends that the traditional analysis and burdens of proof set forth in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), do not apply. (*Id.* at p. 2.) Plaintiff's assertion that the consent decree in *Shuford v. Alabama State Board of Education*, 846 F. Supp. 1511, 1533 (M.D. Ala. 1994), constitutes sufficient evidence of a pattern and practice of the defendants in discriminating against blacks is without merit. The consent decree specifically states: "It is expressly understood and agreed by the parties that by entering into this consent decree the Defendants are not, and shall not be construed as, in any manner admitting liability; nor do the Defendants admit the material allegations of the Shuford complaint as amended." *Id.* Plaintiff has not introduced any

18

Therefore, plaintiff must establish a circumstantial case of intentional individual disparate treatment under the traditional framework discussed below.

The tests for intentional discrimination under § 1981[10] and Title VII disparate treatment are the same. *See Howard v. BP Oil Co.*, 32 F.3d 520, 524 (11th Cir. 1994); *Brown v. American Honda Motor Co.*, 939 F.2d 946, 949 (11th Cir. 1991), *cert. denied*, 502 U.S. 1058 (1992). In the absence of direct evidence of discrimination, a plaintiff must establish the existence of intentional discrimination using circumstantial evidence under the familiar *McDonnell Douglas* framework based on the Supreme Court's decisions in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny. *See Howard*, 32 F.3d at 524; *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1529 (11th Cir. 1992) (applying the prima facie case to a sex discrimination claim) (citation omitted).

Under this framework, plaintiff must first establish a prima facie case of discrimination. In order to establish a prima facie case of wage discrimination, plaintiff, a black female, must show that she occupies a job similar to that of higher paid white or male[11] workers.[12] *See Meeks*

---

additional evidence that the defendants have engaged in a pattern and practice of discrimination.

[10] As will be discussed below, both defendants are entitled to immunity from suit under § 1981 as arms of the State of Alabama. Because the analyses are the same under Title VII and § 1981 for purposes of this case, however, the court will consider the § 1981 claim in the interest of thoroughness.

[11] As noted earlier, this claim is actually barred due to plaintiff's failure to file an EEOC charge alleging discrimination on the basis of sex.

[12] Obviously, the prima facie case must be established against a plaintiff's employer. Defendant Board argues that it is not an employer within the meaning of Title VII, had no contract with plaintiff for purposes of § 1981, and was not and is not plaintiff's employer. The court agrees but will not discuss these issues because, as will be discussed below,

*v. Computer Associates Intern.*, 15 F.3d 1013, 1019 (11th Cir. 1994) (setting out the test for sex-based wage discrimination); *Miranda*, 975 F.2d at 1529. If the plaintiff is successful in establishing her prima facie case, the defendants must then "articulate a 'legitimate, non-discriminatory reason for the pay disparity.'" *Meeks*, 15 F.3d at 1019 (citations omitted). The defendants' burden in this regard is "exceedingly light"; defendants need only proffer non-discriminatory reasons, not prove them. *Id*. (citation omitted). Once the defendants advance such non-discriminatory reasons, the plaintiff must then prove that the defendants actually had a discriminatory intent; i.e., plaintiff must show that "a discriminatory reason more likely than not motivated [the defendants] to pay her less." *Id*. (citation omitted). This proof can be by direct or circumstantial evidence. *Id*. At the summary judgment stage, plaintiff need only raise an issue of material fact as to the employer's intent to survive summary judgment. *Howard*, 32 F.3d at 525. Evidence of intentional discrimination is all that is needed to defeat summary judgment, but the plaintiff must do more than establish a prima facie case and then deny the credibility of defendant's witnesses. *Id*. at 525-26 (citation omitted). "Under *St. Mary's*, a plaintiff withstands summary adjudication by producing sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable." *Id*. at 526 (interpreting *St. Mary's Honor Center v. Hicks*, 113 S. Ct. 2742, 2749 (1993)).

As an initial point, the court points out a major problem with the case that plaintiff has brought. Plaintiff took her position as Director of the Displaced Homemakers Program in 1991. The position was advertised by Bessemer State at a salary range of $28,000-$32,000. She was

---

defendants are both entitled to summary judgment on other grounds.

hired at a rate of $25,200 for nine months and paid a total of $30,240 in her first year.[13] This was within the range advertised for the position. Plaintiff's claim stems from her argument that she was paid too little from the beginning of her employment[14] and has not been given sufficient raises. Any person hired into plaintiff's position would have been paid between $28,000 and $32,000 in the first year. Plaintiff was paid within this advertised range.

Plaintiff makes two basic claims as to her wage discrimination--that she is paid less than whites and males in similar positions and that she has been given smaller raises than some whites and males. Plaintiff has not established intentional discrimination as to either of these claims.

First, as to the raises, plaintiff has not presented evidence that the defendants have discriminated on the basis of race or sex. During the relevant time periods, six schedule C-3 employees at Bessemer State received raises above the amount authorized by the state legislature. Of these six people, three were black--Cynthia Anthony, Gregory Murray, Sundra Smith--and two were women--Cynthia Anthony and Sundra Smith. This is strong evidence that defendant did not

---

[13] Plaintiff asserts in her affidavit that "annual" means nine months and that the $25,200 was, therefore, less than the advertised range on an annual basis. Plaintiff's "annual" salary covered 12 months in every subsequent year, and the plain meaning of annual is that it covers one entire year. *See* G&C Merriam Company, Webster's New Collegiate Dictionary 46 (1977). Without more than plaintiff's conclusory statement in her affidavit as to the meaning of "annual," plaintiff has not raised a question of material fact as to this issue.

[14] Plaintiff has presented evidence of her experience and qualifications as an educator and administrator. Part of her claim is that she has not been paid requisite to this experience. Title VII and § 1981 are not laws to ensure that people are paid in accordance with their qualifications. Title VII and § 1981 are laws designed to ensure that people are not underpaid or otherwise mistreated as a result of improper discrimination.

21

engage in intentional discrimination, but the court will assume, *arguendo*, that plaintiff has established a prima facie case.[15]

Defendants counter plaintiffs claims regarding these raises by stating that the schedule C-3 personnel who received these additional raises did so because they took on additional duties. As noted above, Dennis Winn had his duties expanded, Charles Murray assumed the responsibility of supervising the industrial electronics department, and Dennis Winn had received no raise the year before and received a slightly larger raise in 1993-94. The court is of the opinion that these reasons meet the "exceedingly light" burden that the defendant has to rebut plaintiff's prima facie case.

Plaintiff has not introduced evidence of pretext or intentional discrimination on the part of defendant to survive summary judgment as to her claims with regard to raises. As noted, assuming plaintiff can and has established a prima facie case, Bessemer State has offered legitimate nondiscriminatory reasons for the differences in wages. Plaintiff has not produced sufficient evidence to create a question of fact as to whether the articulated reasons were mere

---

[15] The court has real doubts that plaintiff has established a prima facie case on these facts because blacks and women were among the people given the raises about which plaintiff complains. Plaintiff certainly cannot establish a prima facie case of sex or race discrimination with regard to the raises given to Cynthia Anthony and Sundra Smith, and she cannot establish a race discrimination claim as to the raise given Gregory Murray. Whites and males were also given raises, however, so plaintiff can show that people outside the protected group were treated differently from plaintiff. The court will assume, therefore, that plaintiff has established a prima facie case as to the white males who were given additional raises.

pretext for discrimination. Therefore, defendant is entitled to judgment as a matter of law on plaintiff's claim that defendant discriminated on the basis of race in awarding raises.[16]

Plaintiff also claims that she has been discriminated against with regard to the wage she is being paid, regardless of whether the raises she has received were discriminatory too low. The fact that she was hired at a salary within the advertised range and then received the standard raises in a non-discriminatory fashion should end the inquiry. Plaintiff contends however, that she is being paid less than whites or males performing similar jobs.

As stated above, plaintiff must show that her job is "similar to that of higher paid males" or whites. *Meeks*, 15 F.3d at 1019. Plaintiff argues that the test is really that she must only show that she performs the same "type of tasks" as higher paid males or whites. *See Miranda*, 975 F.2d at 1529. Plaintiff's formulation misses the mark, however. To establish a prima facie case, plaintiff must establish that the jobs are **similar**, not that the employees perform some of the same types of tasks.

Plaintiff asserts that her job is similar to the jobs of Charles Murray, Ralph Bearse, Levell Dansby and Betty Batson. Charles Murray manages a budget of over $1 million and supervises 14 employees. Aside from the many other differences outlined in the factual summary above, these two facts alone demonstrate that Charles Murray's job is not similar to plaintiff's job. As

---

[16] As noted, the fact that three of the six people given larger raises were black and two were women makes plaintiff's task of showing intentional discrimination all the more difficult. In fact, Cynthia Anthony and Sundra Smith, black females, received some of the largest raises of the group.

23

noted above, plaintiff manages a budget of about $49,000 and supervises one part-time secretary. As a matter of law, these jobs are not similar.[17]

Ralph Bearse also manages a much larger budget than plaintiff--$250,000 for course and curriculum development and $750,000 at one point as the Interim Director of the Allied Health Programs. Ralph Bearse is Bessemer State's Curriculum Specialist and performs the various duties outlined in the factual summary above. This job is quite simply much different from plaintiff's. Again, as a matter of law, Ralph Bearse's job is not similar to plaintiff's.

Levell Dansby is black so plaintiff cannot establish a prima facie case of race discrimination with regard to him. Furthermore, Mr. Dansby is the coordinator/instructor of the Associate Degree Automotive Instructional Program. Again, plaintiff has not introduced evidence that her job is similar to his. Thus, even if plaintiff had filed a charge of discrimination on the basis of sex, plaintiff has not established a prima facie case of sex discrimination with regard to Mr. Dansby.

Finally, Betty Batson was a schedule C-1 employee who had been at Bessemer State for more than 20 years when she retired. Although plaintiff did assume some of the duties that Ms. Batson had performed, plaintiff did not assume all of them. At the same time that Bessemer State hired plaintiff, it also hired a new counselor to take over some of Ms. Batson's duties. Other employees at Bessemer State also assumed some of Ms. Batson's duties. Plaintiff has not

---

[17] Plaintiff counsel's assertion at oral argument that plaintiff should be getting paid more because she has to work harder due to her small staff and small budget is without merit. The reality of the work force in this country is that people with more responsibility command higher salaries; managing a larger budget and supervising more workers are indicia of greater responsibility.

established a prima facie case of race discrimination[18] with regard to Ms. Batson because plaintiff has not introduced sufficient evidence to show that their jobs were similar for purposes of proving wage discrimination. Also, as noted above, Bessemer State would have paid anyone that it hired to replace Batson significantly less than it had been paying Batson because the top of the advertised range ($32,000) was over $20,000 less than Batson's final salary ($55,000).

Assuming, *arguendo*, once again, that plaintiff established a prima facie case of wage discrimination with regard to any or all of the employees listed above, defendants have rebutted that prima facie case for the same reasons as the court has held that no prima facie case was established. The plaintiff and these employees performed different tasks for Bessemer State, had different levels of responsibility, managed different sized budgets, supervised different numbers of personnel and had different levels of experience. The defendants have met their burden of producing legitimate, non-discriminatory reasons for disparities in the salaries of plaintiff and the employees listed above.

The plaintiff has not countered defendants' evidence by introducing evidence of intentional discrimination to establish pretext on the part of defendants in the wage Bessemer State has set for plaintiff. Plaintiff has made an assertion that the jobs are similar, but plaintiff has not produced evidence that the defendants' stated reasons for the disparities in pay are not true or that these reasons are a mere pretext for discrimination. Therefore, plaintiff has not raised a question of material fact on her race or sex based wage discrimination claim. Further, plaintiff was paid within the advertised range when she was first hired as Director of the Displaced Homemakers

---

[18] Plaintiff cannot establish sex discrimination with regard to Ms. Batson because both are women.

Program and has been given her regular raises in accordance with legislative authorization. Plaintiff has not shown those raises to have been with discriminatory intent, and these facts further bolster defendants' rebuttal of plaintiff's case.

## II. Retaliation

In her second EEOC charge, plaintiff alleged that she was being retaliated against for filing her first EEOC charge, and paragraph 15 of plaintiff's complaint alleges retaliation on the part of defendant Bessemer State.

To establish a prima facie case of retaliation, plaintiff must show that she engaged in statutorily protected expression, some adverse employment action was taken against her and a causal link between the expression and the adverse action. *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993) (citation omitted). In order to establish the causal link, plaintiff must show only that "'the protected activity and the adverse action were not wholly unrelated.'" *Goldsmith*, 996 F.2d at 1163 (citation omitted). In other words, "[a]t a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took [the] adverse employment action." *Id*.

If plaintiff establishes a prima facie case of retaliation, Bessemer State then has the burden of showing legitimate, non-discriminatory reasons for its actions. *Meeks*, 15 F.3d at 1021. As above, this burden is "exceedingly light." *Id*. If the defendant meets this burden, plaintiff must "demonstrate that the employer's proffered explanations are a pretext for retaliation." *Id*. Each alleged incident of retaliation will be discussed under this framework below.

The filing of plaintiff's first EEOC charge meets the requirement of statutorily protected expression. Plaintiff contends that she was not given raises or paid more than she was in

26

retaliation for filing her EEOC charge.  Wage discrimination, however, was the basis for plaintiff's first EEOC charge.  Therefore, plaintiff is not alleging that Bessemer State is doing anything new because of her filing the EEOC charge.  To the extent that Bessemer State was discriminating at all against plaintiff as to her wage, it was already doing so before she filed her first EEOC charge.  Plaintiff's initial wage was set long before she filed her EEOC charge. Furthermore, as was already discussed above, the defendants articulated legitimate nondiscriminatory reasons for giving plaintiff the raises she was given and for not paying her more than she was paid.  Plaintiff has not shown these reasons to be a pretext for discrimination.

Plaintiff also claims that she was not informed in a timely manner regarding a meeting in Montgomery that was relevant to the program she directs.  As noted above, plaintiff attended the meeting and could not provide any additional facts as to how she was retaliated against with respect to this meeting.  Plaintiff has not shown that defendant took the action[19] or that it was adverse.  Plaintiff did attend the meeting, and no action was taken against her for doing so.

Plaintiff also alleges that Bessemer State retaliated against her by making her drive a proposal to Montgomery.  Assuming this is an adverse action,[20] and that plaintiff has established a prima facie case with respect to this claim, defendant has articulated sufficient legitimate, non-discriminatory reasons for its actions.  According to defendant, Dr. Bailey was unavailable to sign

---

[19]  According to plaintiff's deposition, she did not know when Bessemer State (Dr. Bailey) first learned of the meeting.  For all the plaintiff apparently knew, it was the fault of the Department of Postsecondary Education that the information was delayed.

[20]  The court has serious doubt that this was an adverse action.  This type of incident occurred only once, and plaintiff has not shown that she had to work more or harder as a result of driving to Montgomery.  Plaintiff did not show any financial or emotional harm from the trip.

the proposal until the last day and did not sign it until the last day. Furthermore, Ed Blake had intended to drive the proposal himself but had to leave too early in the morning. Therefore, plaintiff drove to Montgomery to deliver the proposal. Plaintiff has not produced evidence that defendant's reasons are a pretext for illegal retaliation. Plaintiff has made conclusory allegations that defendant's actions were retaliatory, but she has not produced evidence that they were.

As to the exchange of memoranda between plaintiff and Debbie Marcus and others, plaintiff has not established a prima facie case of retaliation with regard to the actions of Debbie Marcus. Plaintiff did not allege that the occurrences leading up to the series of memoranda were retaliatory. Furthermore, the memoranda sent by Ms. Marcus were not retaliatory. First, Ms. Marcus was not in a position of authority over plaintiff, so Bessemer State did not "act" when the memoranda were sent. Second, writing responsive memoranda does not constitute an adverse employment action--she was merely responding to plaintiff's memorandum that plaintiff sent to Ms. Marcus, among others. Third, plaintiff has not shown that the actions were not "wholly unrelated." Plaintiff has not submitted evidence, of which the court is aware, that Debbie Marcus knew or even might have known that plaintiff had filed a charge of discrimination with the EEOC. As the court noted above, at a minimum plaintiff must show that the actor was aware of the protected conduct. Even if plaintiff could make out a prima facie case, Ms. Marcus had a legitimate reason for responding to plaintiff's memoranda, and plaintiff has not introduced any evidence that Ms. Marcus's reasons were a pretext for illegal retaliation.

Plaintiff perhaps has made out a prima facie case as to other actions taken by Bessemer State with regard to the memoranda. For purposes of deciding this motion for summary judgment, the court will assume that having discussions with plaintiff about the memoranda and

28

putting the memoranda in plaintiff's personnel file are adverse employment actions. The plaintiff has, therefore, established a prima facie case. Defendant has stated legitimate reasons for its actions, however. As noted above, plaintiff's memoranda made various references to "genealogical inheritance," "societal position/worth," and being "invisible." In light of those claims and the number of memoranda being exchanged, no reasonable jury could conclude that Ed Blake discussed the issues raised by plaintiff in her memoranda in retaliation for her having filed an EEOC complaint. In fact, if he had ignored plaintiff's accusations, it could be argued that he was ignoring her complaints of unfair or discriminatory treatment. Plaintiff did not allege facts showing that Mr. Blake was accusatory in the discussion, and Blake's memorandum to plaintiff shows that they were trying to prevent the problem from happening again. Furthermore, if defendant did put these memoranda in plaintiff's file, that is not unreasonable given the nature of the allegations in the memoranda sent by plaintiff. Again, no reasonable jury could conclude that defendant's actions were based on illegal retaliation. Therefore, defendant has rebutted plaintiff's prima facie case. Plaintiff, on the other hand, has not presented any evidence that defendant's reasons were pretextual. All the evidence, in fact, shows that defendant acted for exactly the reasons it said it did.

As for the reduction in plaintiff's performance evaluation, the evidence reflects that the same type of action was taken against two white males who had not filed charges of discrimination. It is possible that an employer, in order to cover illegal retaliation, would take adverse action against an employee who had not engaged in protected activity at the same time as it took adverse action against an employee who had engaged in protected activity. Here, defendant lowered the evaluations of plaintiff and two white males who had not filed EEOC

charges. Although defendant could cover illegal retaliation in such a manner, in this particular case, the court does not find such a scenario plausible. Nevertheless, because all inferences must be drawn in favor of the plaintiff, the court will assume that plaintiff has established a prima facie case of retaliation with regard to the lowering of her evaluation. Defendant has articulated legitimate reasons for this action, as well. Dr. Bailey was concerned that Ed Blake had overrated every person that he had evaluated. Blake had rated those three employees higher than any others had been rated, and the three that Blake had evaluated were the only three employees to receive overall evaluations of superior. Dr. Bailey requested that Blake reevaluate the three employees according to his stricter standards. Blake followed this directive and reduced the rating of all three employees. Plaintiff's unsupported allegation that Dr. Bailey and Blake reduced the evaluations of Winn and Craig to cover for their retaliation against plaintiff is not sufficient evidence of pretext, and plaintiff has not introduced any other evidence of pretext with regard to this claim of retaliation.

Plaintiff has established a prima facie case of discrimination with regard to the relocation of her office. Taken in the light most favorable to the plaintiff, the facts show that plaintiff's new location was inferior to her previous location. Her "Dressing for Success" boutique was less accessible because it was in the basement of the new building, plaintiff had less access to a classroom, and plaintiff's new location was wanting in "proper facilities" for supplies and other career training materials. Plaintiff did concede, however, that she still had a nice office, even though it did not meet the total needs of her students. Therefore, moving plaintiff's office was an adverse employment action. The other two prongs of the test, protected conduct and causation are also present--plaintiff had filed her EEOC charge and Bessemer State knew about it.

30

Defendant has articulated legitimate, non-discriminatory reasons for moving plaintiff's office. Defendant has shown that it needed additional space for the LPN Program and moved the LPN Program into the space in which plaintiff had been located. The LPN Program was a larger program than plaintiff's and needed more space. As Ed Blake explained, the move of plaintiff's office was part of a routine move to better utilize the limited space at the college. Plaintiff has not introduced any evidence of pretext with regard to defendant's explanation. There is no evidence that the LPN Program was smaller, that it did not need the space, that plaintiff could have been put in a better office than the one in the Millsap Building or otherwise. As noted above, plaintiff even admitted she had a nice office.

Finally, it should be noted that although plaintiff has used the term "hostile environment" in her pleadings and briefs, plaintiff has not introduced any evidence of the kind of "severe and pervasive" harassment necessary to establish a hostile environment claim. *See Harris v. Forklift Systems, Inc.*, 114 S. Ct. 367, 370 (1993) ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive--is beyond Title VII's purview"). Therefore, as to all of plaintiff's retaliation claims, plaintiff has failed either in her duty to establish a prima facie case or to produce sufficient evidence from which a reasonable jury could conclude that the legitimate, non-discriminatory reasons articulated by the defendant for its actions were a pretext for illegal retaliation. Consequently, defendant is entitled to summary judgment on all of plaintiff's retaliation claims.

31

. ‛ ᵃ

## III. Eleventh Amendment Immunity and § 1981 and § 1983 Claims

Both the Board and Bessemer State are entitled to Eleventh Amendment immunity as to plaintiff's § 1981 and § 1983 claims. The Eleventh Amendment prohibits a district court from exercising jurisdiction over a suit against a state unless the state has consented to the suit or Congress has abrogated the immunity. *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Thus, "[i]t is clear . . . that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Id.* The State Board of Education is an elected body that is the advisory and regulatory arm of the Alabama Department of Education. *See* Ala. Code §§ 16-3-1, 16-2-1 to 16-2-2 (1995); *see generally* Ala. Code §§ 16-3-1 to 16-3-39 (1995). In addition, where the defendant is an entity other than the state but the state is the "real party in interest" the suit may still be barred. *Id.* at 1485. The Eleventh Circuit has previously held that a state university in Alabama is an arm of the State of Alabama and is entitled to Eleventh Amendment immunity. *Harden v. Adams*, 760 F.2d 1158, 1163 (11th Cir.), *cert. denied*, 474 U.S. 1007 (1985). Similarly, the State of Alabama is the real party in interest in a suit for monetary damages against Bessemer State because Bessemer State is a junior college or trade school of the State of Alabama. *See generally* Ala. Code §§ 16-60-80 to 16-60-114. Thus both the Board and Bessemer State are entitled to Eleventh Amendment immunity where the state has not waived it and Congress has not abrogated it.

The State of Alabama has not waived and Congress has not abrogated Alabama's immunity under the Eleventh Amendment with regard to § 1981 and § 1983 claims. *See Gorman v. Roberts*, 909 F. Supp. 1493, 1502-03 (M.D. Ala. 1995) (citations omitted). Therefore, as

32

arms of the state, both the Board and Bessemer State are immune from claims based on §§ 1981 and 1983.

Even if defendants were not immune from suit under §§ 1981 and 1983, they are entitled to summary judgment on any claims brought by plaintiff under §§ 1981 and 1983 for the same reasons explained above that they are entitled to summary judgment on plaintiff's Title VII wage discrimination and retaliation claims.

### CONCLUSION

For the reasons stated above, defendants are entitled to summary judgment on plaintiff's wage discrimination and retaliation claims. Plaintiff has failed to raise a question of material fact, and defendants are entitled to judgment as a matter of law. An order in accordance with this memorandum opinion will be entered contemporaneously herewith.

DONE this ___31st___ of January, 1997.

_Sharon Lovelace Blackburn_

**SHARON LOVELACE BLACKBURN**
United States District Judge

SCANNED
BY